All right, I'm pleased to hear Estate of Armstrong v. The Village of Pinehurst. Mr. Truese, whenever you're ready. Good morning, Your Honors. May it please the Court. My name is Karani Truese, and I represent the Plaintiff Appellant in this matter, the Estate of Ronald Armstrong, seated at Council Table with me is Attorney Marshall Hurley. Your Honor, Ronald Armstrong was sick. He was scared, he was afraid, and he needed help. Three officers were called from the Village of Pinehurst on the day of these events, and instead of using calm and the training that they were skilled and had been trained in doing with regards to crisis intervention, they chose to use a force against Mr. Armstrong, excessive force. The Court has been asked today to review over the process that took place on the summary judgment hearing in the Middle District of North Carolina, in which summary judgment was granted in favor of the defendants. The Court has been asked to use the two-step analysis set out by the Supreme Court in Sausher v. Katz and determine whether the facts taken in the light most favorable to the plaintiff show that the officer's actions violated a constitutional right, and second, whether the right at the issue was a clearly established right at the time of the conduct of these officers. With regards to that, Your Honors, the plaintiff would point the Court to the case of Graham v. Conner. In order to determine the reasonableness of the officers, the case of Graham v. Conner set out four factors that the Court is to consider when considering whether or not the officer's force… What was unreasonable about the officer's behavior here, given the circumstances? Your Honor, the use of anything other than minimal force was unreasonable. And the reason anything other than minimal force was unreasonable was because of the Graham factor. Your Honor, the first Graham factor that is to be considered is the severity of the crime. I would point out to this Court that at the time that the officers arrived at the scene and received the involuntary commitment order… They talked to him, and his sister was trying to get him to a hospital where he would be safe. He was under a civil commitment order, and the officers graduated force here. They talked to him initially, trying to induce voluntary compliance. That was admirable, don't you think? Judge Wilkinson, I would agree that they did talk with him for a period of time prior to receiving the involuntary commitment order. That is correct. However, once they received the involuntary commitment order, the facts changed. Mr. Armstrong's attitude at that point in time changed. And instead of the officers using calm and using the main thing that they had been trained to do, which is using time with regards to someone with a mental condition, they jumped to the use of tasers. When you're talking about the unreasonable or excessive use of force, are you limiting your argument today to the taser? Absolutely. Or are you also talking about them kneeling on his back and the other actions that took place during the course of this encounter? That is absolutely correct, Judge Keenan. We are not just considering the tasering of Mr. Armstrong. We're considering the totality of the force that was used against Mr. Armstrong. The tasering is just one factor or one fact with regards to the type of force that was used against Mr. Armstrong. It's important to point out that there was no crime that had been committed. He was being under a civil involuntary commitment order, and the officers had been called there to keep Mr. Armstrong from harming himself. The doctors had a fear that Mr. Armstrong was a threat to himself, and at that point in time should have used caution with regards to handling Mr. Armstrong. Could I ask you one question for clarification? As far as I can tell, listening to this video, the 30 seconds elapsed between the time that one of the officers announced they had the order and the time that the tasing started. Is that accurate? That is accurate, Your Honor. I will point out to the court that unfortunately we do not have actual video of the event because the cameras were pointed away from the incident taking place, but we do have the audio, and from the time that the commitment order came in, that is correct. There was 30 seconds before Lieutenant McDonald told Officer Gatling, let's just tase him. The decision had been made once they received that order to tase Mr. Armstrong. It's important to note that when they approached Mr. Armstrong… There was a good bit of background to that. It wasn't there. They were under some exigent circumstances here because they were holding a stop sign near a busy intersection. Cars were coming back and forth. The dangers of acting erratically could have produced a serious tragedy. A car could have overrun him. He was behaving in a bizarre and self-destructive manner, burning himself with cigarettes and eating grass. You don't know what he would have done. It's not a situation that would allow for the infinite use of time, but even there, the use of force was very graduated. Your Honor, I would agree with Your Honor if that were the case. However, that was not the case, Your Honor. There was plenty of time for the officers to react to this situation, and unlike a fast-moving, non-stop situation where officers are oftentimes called to, this was a static situation. Your Honor, once the order came in and the officers told Mr. Armstrong that they needed to take him into custody to the hospital some hundred yards away, Mr. Armstrong grabbed a hold of the pole with his arms and his legs, and he sat on the ground. At that point in time, he was no longer a threat to himself, nor was he a threat to the officers. His arms were wrapped around the pole, and by all testimony, he was holding on to the pole, non-moving. The officers had surrounded him at the time, and there was no threat that Mr. Armstrong would jump up immediately and run out into traffic. Isn't that 20-20 hindsight? Your Honor, that's not 20-20 hindsight. That is a static situation in which the officers were placed with at that point in time. How is it a static situation when his sister wants him to be hospitalized when he's under a civil commitment order for a reason? Your Honor, from the moment and point in time in which Mr. Armstrong grabbed onto the pole and sat down on the ground, he was no longer a threat. He was not attacking any officers. There was no mention in any of the depositions that there was any verbal or any physical threat to himself or to the officers at the point in time period that he grabbed onto the pole. That became a static situation at that point in time. Is there any evidence in the record that he tried to hit the officers after he was grabbing onto the pole? Absolutely not from the officers, Your Honor. Lieutenant McDonald, Officer Gatling, as well as Officer Shepard all testified that Mr. Armstrong never attempted to swing at them, never attempted to kick them, never attempted to bite them or anything. He was completely holding onto the pole in which they could not pry him loose. At that point in time, the facts of this case changed and demanded that there be time given to calm Mr. Armstrong down instead of the immediate jump to the use of force. Once those conditions changed and Mr. Armstrong grabbed the pole, it demanded if not dictated calm by the officers. That is what their crisis intervention training has said. Likewise, the officers had 24 hours to take Mr. Armstrong into custody. They were in front of the very hospital that they were going to place Mr. Armstrong in some hundred yards away. They had plenty of time to commit Mr. Armstrong. Again, going back to the grand factors, there was no crime being committed. There was no immediate threat to the officers. They have an obligation to carry out a civil commitment order. I don't know if they had time. I suppose he'd let go of the stop sign and run into the street. Then the officers would have been subject to second guessing from another perspective. Mr. Armstrong was holding onto the pole with dear life at the time that the officers approached him and began to tase him. If I saw someone eating grass and burning themselves with a cigarette, I would think he might do anything. That is correct, Ron, and I think that's also why it's important. In other words, it seems to me there was a high element of unpredictability to the situation. I don't understand whether you use the word static. It seems to me it was anything but static. Again, if I saw somebody in front of me eating grass and burning himself with a cigarette, I would want to get that individual out of that situation as soon as possible because it posed a danger to him and to oncoming motorists. And, Your Honor, I would agree with that. However, that is not the facts that we have in this case. At the point in time in which Mr. Armstrong was eating the grass and was putting the cigarettes out on his body, they did not have the involuntary commitment order. At that point in time, when they got the involuntary commitment order, the set of facts changed. Their duties changed. It doesn't simply cut off everything that they knew before. You say the facts change. Well, of course, the involuntary commitment order is a change in a fact, but it doesn't simply pull the curtain on everything that the officers had observed before and everything that they knew before. You can't simply chop it up and segment it. You have to take the encounter as it unfolded in its totality. I would agree with that, Your Honor. And at the time and period that they were observing Mr. Armstrong doing these self-destructive behaviors, they were made aware of that, that he was bipolar and that he was schizophrenic. It's important to note that prior to receiving the involuntary commitment order, the officers were walking back to their vehicles to leave the scene, because they knew that without the involuntary commitment order, they could not do anything with Mr. Armstrong. So they were going to leave him there, knowing this behavior, prior to receiving the involuntary commitment order. Well, of course, in the future, because you have to consider what's going to happen, officers just will be people there. They'll leave them in very hazardous situations. Those people will get hurt. Others will get hurt. And a certain amount of deterrence is a necessary and good thing. If you over-deter, you have individuals like the plaintiff here who will do themselves, fail and harm, and others along with them. I've always thought, to me, that we sit in this very calm courtroom and take situations apart in the most microscopic detail. And fail to put oneself in the situation of people who are at a busy intersection, who are very dangerous, a person exhibiting unpredictable, erratic sorts of behavior. You do the best you can in those situations, and sometimes maybe you don't act perfectly. But when you read Graham itself, it does caution against hindsight. I would agree with that, Your Honor. However, it can't be lost, the fact of why these officers were there. They were there because Mr. Armstrong was sick. He needed their help. He did not need them to use excessive force against him. They had been trained. They were trying to get him to the hospital. They were attempting to help. There's a Ninth Circuit case with regards to Drummond v. Anaheim, the city of Anaheim, which I believe may lend some guidance to this court. And in that case, it was a very similar situation in which the officers were called to a scene to involuntarily commit a patient. There was the restraining of this patient, and the officers placed force on his torso and on his back, and he died of positional asphyxia, very similar to what took place in this case. And in that case, the court recognized that, number one, based on the Graham factors, all of those factors except for active resistance were in favor of the plaintiff. So the force was excessive with regards to what was used against the plaintiff in that case. Likewise, with regards to whether or not the officers did what was reasonable, when considered with regards to their actions, and this was a mentally ill patient, time should have been used. And this patient, it defeated the purpose with regards to what they were there to do that day and help this patient by causing serious injury to the patient, which is what we have here. My concern is that if attempts to help and to enforce civil commitment orders are going to be punished in this fashion, I know you'd say, well, they'll just go about it in a different way. I think police officers just won't go about it at all. They just will lead people to whatever fate happens to befall them. Ultimately, these may seem to be humane results, but if you take the fact that no attempt to help goes unpunished, these cases are going to be taught. And they'll be taught in police officers' classes, and the officers will be sitting there and say, well, I'm going to wash my hands of it. And that's what the instructors will be teaching them to do. And you're saying they don't even have qualified immunity. I'm saying you, despite our cases, despite a long line of cases saying that somebody who is resisting can be hazard, that this situation is so clear that there's not even qualified immunity. Regardless of how one feels about the underlying situation under Pierson v. Callahan, we don't need to reach that. But you're saying this situation is so clear-cut. These people acted so wrong that this is a clear violation of clearly established law, no judgment calls, no gray areas, no qualified immunity. And you're saying that officers are not going to, in the future, when they're deprived of that judgmental protection, they're just not going to lead people to whatever fate happens to befall them. Your Honor, I see that my time is up. May I answer that question? Certainly. Your Honor, it is the opposite. These officers need guidance with regards to these types of situations. The facts in this case did not warrant the type of force that was used. Whether it be the tasering, whether it be the standing on this gentleman's back, whether it be placing a knee between the back, whether it be leaving him on the ground as he choked, whether it be choking him, officers need guidance with regards to that. And they had the guidance under the Graham v. Conner case as well as under the Pierson case that said... It's hard to provide guidance because the facts of no one case are entirely duplicative of another. That is correct. But these officers had fair warning that excessive force in this type of case was unreasonable. Okay, that strikes me as a very general statement. But anyway, I understand your argument. You have some rebuttal time as well, sir? That is correct, Your Honor. And we thank you for your argument, Mr. Hartzog. Thank you, Your Honor. May it please the Court. I'm Dan Hartzog together with Dan Hartzog, Jr. and Mike Newman. We represent the defendants, the village of Pinehurst, and the three officers, Lee Gatling, Sergeant Shepard, and Lieutenant McDonald, the defendants in this case. I think Judge Eagles correctly decided this case. And it's interesting that the sentence that she uses in her order is, Nonetheless, the officers found themselves in the middle of a volatile situation on the side of a busy road with a person whom a medical professional had found was a danger to himself or others, and whom they had a duty to take into custody. And, Your Honors, that is exactly what happened in this case. That is how we found ourselves in the situation where we were. Okay, Mr. Hartzog, though, I'm concerned whether the trial court relied on the facts here. She's supposed to be taking the facts in the light most favorable to the plaintiff. And she recited something at the top of page two of her order that is factually inaccurate, even in the light most favorable to the defendant, as far as I can tell. And that is her statement right at the beginning of top of two that three officers tried for several minutes to pull and pry Mr. Armstrong off the pole, but he actively resisted and they could not get him loose. That one officer then used his taser. So she's saying that the officers were trying to pry and pull Mr. Armstrong for several minutes before they resorted to the use of the taser. And that's not correct. When you listen to that video, it's very clear. Sergeant Shepard engages in 28 minutes of conversation, then the one officer announces they have the warrant, and it's 30 seconds before they start using the taser. They did not try to pull and pry him off the pole for several minutes. That's clearly erroneous, unless you can convince me otherwise. Well, Your Honor, my recollection of the evidence from the depositions is that they did, in fact, try to pull him off the pole. I think that is in the... But if you listen to that video, and we've got to take this testimony in the light most favorable to the plaintiff. It may be that the officers did and that a jury would decide that, yes, the officers did try to pull and pry him off, but when you listen to that video, they did not. 30 seconds elapsed, and they did not. They immediately went to the taser. They weren't trying for several minutes to pull and pry him off the pole. Your Honor, again, my recollection of the deposition testimony is that the officers had tried to pull him... But we're dealing with the light most favorable to the plaintiff here, and the light most favorable to the plaintiff is there is evidence that they did not do what the trial court said they did. Yes, ma'am, I understand your point. I would simply say that, unfortunately, we don't have the video of the dash cam. We only have the audio, so we can't see what's going on. Right, but you can measure 30 seconds, and that's not several minutes. During that 30 seconds, ma'am, I do believe they were trying to pull and pry him off of the post. That's why Sergeant Shepard actually had a cardiac event from the efforts used to try to pull him off of that post. They did try to do that before they used the taser. The light most favorable to the plaintiff, they didn't. Maybe a jury would find that. There is a tension here between... You have, on the one hand, a summary judgment standard where you accord the plaintiff the benefit of the infancy, but there's a tension between that and qualified immunity, which is that you accord the benefit of judgment in these situations and circumstances to the defendant. As the Supreme Court has made clear, when you start pushing the summary judgment standard of the way you take the inferences, that that simply negates the entire value of the immunity. The value of the immunity is not to have to go before a jury. The Supreme Court has said that over and over again. As far as what happened before and after the Civil Commitment Order, the officers after they received the Civil Commitment Order were entitled to take into account the entire course and stream of events before they were presented by the Civil Commitment Order. It wasn't as if they arrived right after they were on the scene that the Civil Commitment Order was handling. There was a history there before the Civil Commitment Order was ever given them. Yes, sir, you are. And I believe that the best witness, maybe of all in this, is Gina Lopez, the sister and plaintiff in this case who very much wanted... She kept saying to Ronald Armstrong, stop fighting, quit fighting them, stop fighting them. And she wanted him, they all wanted to help him get into the hospital. He didn't start fighting them until after he was tasered, though, did he? He was not. I think what she was referring to, Your Honor, was that he was not letting them take him because they were trying to get him off of that post and they couldn't. And so he was very actively resisting very much and they were pulling him and he was pulling back. It wasn't... There's some testimony from the security guards that he was kicking and that sort of thing, but I would not represent that he was trying to assault the officers. I think what he was trying to do was to maintain his position on that post and they were trying to get him off. And that was very much active resistance. After the two security guards got there to assist the three officers, the five of them were able to get him off the post, even after he was tasered, right? Yes, ma'am. So why wouldn't it have been more reasonable for the officers to just wait for the security guards or some other backup to get there? They only needed two other people. He was sitting down on the ground to move him off the pole that had tasered him after 30 seconds. I suppose in hindsight, Your Honor, you could look at that and say, okay, maybe they could have done that. What these officers had when McDonnell came, he was getting ready to clear the scene because they had no reason. They had not touched him at that point. They had no reason to touch him. They had nothing to do. His sister was there with him. They were prepared to clear the scene and leave. A nurse from the hospital had come out there, Wayne Morton, and he saw all of this. He went back in the hospital where Mr. Armstrong had run out, leaving the wires coming out of his arm from the IVs. He had run out there and Wayne Morton goes back in and gets this order, this involuntary commitment from Dr. Gibbons, who signed that saying he needed to be in the hospital right now. Then they come out and say, okay, we've got the order. That order under 122C in North Carolina says you shall take him into custody and take him to the hospital. Who was he a threat to at that point? A threat to Mr. Armstrong himself. How could he have been a threat to himself with all four limbs grasping onto the pole? How could at that moment, when all four limbs were engaged in grasping the pole, how could he have been a threat to himself? He couldn't use his hands and he couldn't use his feet. Where was the threat to himself at that point in time? He showed how quickly he could change, Your Honor, when they got the order of involuntary commitment. No, I'm asking you, at the time when all fours were grasping the pole, how could he have endangered himself? Well, I happen to believe that there's a very strong inference that by grabbing as he did on that post may have led to his ultimate death. I think he may have harmed himself by doing that. He certainly could have gotten up and run just two or three feet and been in the street. And they could have restrained him if he had done that. If he attempted to stand up, he was sitting on the ground holding onto the pole. He hit the ground, then grabbed the pole. If he had tried to stand up, they could have grasped him. I mean, isn't that obvious? He wasn't a threat to anybody when he was sitting grasping the pole. I think he was primarily a threat to himself. He had just basically assaulted a person in the hospital. I mean, I don't know what Mr. Armstrong as a bipolar schizophrenic might have done. The lab tech indicated in the record that she felt threatened when he leapt. They were taking blood or putting in IV medication when he jumped up and leapt. And she said that she felt threatened. That's in the record. But he was pulling his IV out. He wasn't doing anything to the lab tech. I don't know that. I mean, I just know what... Your subjective feelings of fear aren't really relevant to whether he was a danger to himself when he was holding onto the pole, is it? No, I'm just saying that as a person with the condition that Mr. Armstrong had, there's just not much way for me to tell what he might have done had they simply left him there. I don't know. How far was it from the stop sign to the traffic intersection? Oh, Your Honor, I believe it was like two feet. It was very close. It's a stop sign right on the intersection there. And it's 645 at night. He decided to run away from the officers. That could have happened in a matter of seconds. That's correct. He couldn't have run away, though, without standing up first. Isn't that correct based on the record? Yes, ma'am. He was sitting down. That's probably correct. Yes, ma'am. And he had already been in the road. His sister had and one of the security guards had to talk him out of the road onto the side of the road. I mean, he was obviously not in any condition to take care of himself. And they were all trying to get him into the hospital where the doctor said he needed to be. And these police officers have in effect an order that they have to take him into custody. They don't have the option of letting him within 24 hours. But 24 hours, Your Honor, as I understand it, means they have 24 hours to serve, to go actually execute the papers. That means if you can't find him, he may not be where you can get him. You have 24 hours to go and locate him and take him into custody. I don't think that means they have 24 hours to stand there at the signpost and see what else they might come up with to get him off the post. They understood that order to mean that they had to do it now. And that's what the doctor said he meant. He needed to be in the hospital right then. The ironic thing about this really is that they were, all of these people involved were trying to help Mr. Armstrong. He was resisting help. He was resisting help from his sister. He was resisting help from the hospital personnel, from the doctors. He was resisting help from these officers who were simply trying to do their duty to take him into the hospital. That's what they were going to do with him, was take him to the hospital. They had not had a chance to frisk him or anything? No, sir. Did they know, did he have a razor blade or did he have a gun? Was that known? I mean, did they have a chance to frisk him? It was not known, Your Honor. What they said was they did know that they had weapons, so if they're down there dealing with him with their weapons on their side, there's a weapon right there. But there's no testimony that when all fours were engaged to the pole that anybody tried to frisk him. They certainly, no reason why they couldn't have, right? They were inclined to. They were busy trying to get him off of the pole and get him into the hospital. They didn't know what he might have on his purse. That's right. How long, I mean, how long did this whole thing take, how long did it take for this series of events to transpire? I think it was less than ten minutes. I mean, this is after they got the order. During the ten minutes, it was six and a half minutes, wasn't it? Six and a half minutes, I believe it was. That's correct. And is the stop sign in an island between I think the traffic. My recollection is that it's at an intersection that's just off the side of one of the roads, but it's right at another road, right there in front of the hospital on Memorial Drive in Pinehurst, so it's very, very close to the road. And this was 645 at night. And there was traffic. 645 p.m. p.m., yes, sir. It was daylight, though. I mean, it was April. It was still light at that point, but it would have been getting dark to the point that they could not have simply let this go on into the evening. You know, Mr. Hertzog, you know, the thing that just really troubles me about this case so much is the fact he was sitting on the ground. I think your arguments get a lot stronger if he was holding onto the pole and could have broken free and run into the street. But he was sitting on the ground with all fours, so he would have had to have stood up before he could have done anything. So why doesn't that create a problem for your analysis? Because the fact that he was sitting on the ground means that he was not obeying lawful orders and he was not allowing the police officers to execute that custody order and take him to the hospital. He was resisting basically arrest. He was resisting by failing to comply and failing to respond, even when they tried to pull him off. And his sister is yelling at him, Ronald, stop fighting them. Stop fighting. So from your perspective, it doesn't make any difference that he didn't commit a crime? Not at all, because they had basically an order to take him into custody, which was a lawful order under North Carolina law. It wasn't signed by them. So it's irrelevant to the analysis is what you're saying. I wouldn't say it's irrelevant, but I don't think they had they didn't have a lot of good options. And I remember at the hearing on the summary judge... I think that makes a very thoughtful point about sitting, but the response is that this is somebody who really did not like the officers being there. Whether he was actively resisting arrest, he was actively resisting going into the hospital. He did not want to be taken back to the hospital for whatever reasons, and they may have been good ones. That hospital was the last thing he wanted to go to. And the police officers were there to take him to a place he did not want to go. And it doesn't take a whole lot of time for somebody who does not want to be in a hospital and who does not like the police officers around him to bolt up and try to get way away from them by running away from them perhaps into heavy traffic or to who knows where. The dynamics of the situation was he didn't like them there, he didn't want to go where they were taking him, and it's very plausible that it would take the split second to jump up and head to the hill. And so these people, these officers, you're right, they were trying to help by the objective evidence. And they can't win these days. They can't win. Does the record show how much he weighed? Yes, I think it's 260 pounds. Right. And does the record show how tall he was? I want to say 5'9". I think it is in the record. His autopsy is in the record. How old was he? 43, soon as 40. Okay, so we have a 43-year-old man who weighs 260 pounds who's sitting on the ground. Well, three officers and two security guards couldn't pull his arms off of the post. Right, but I'm talking in terms of being a flight risk. Well, I don't know how fast he could run, but I know he wasn't very far from the road, and I know he had already been in the road that day, so his sister was as concerned as anyone. And I think if you read her testimony, you really get the idea of what's going on here. His sister was not that critical of the police in her testimony. I mean, she filed a complaint in which she said all sorts of things about him beating him with batons, and that never happened. These people were simply there trying to get him into the hospital. But isn't the ultimate point the fact that this is the kind of case for which qualified immunity is made? It's these kind of gray judgments that you can go a different way in hindsight, but the Supreme Court, I don't know how many times they have to say it, that judgments in gray areas, you ought to record some respect for the people who have to make them. I've never made one of these judgments in my life. I don't know that I could make it any better than what these folks did. You get to the point where people are trying to help someone, and what do they get for it? A 1983 suit. And, you know, it's having an effect. They're just officers. They're not stupid, and they know the suit's out there. They're just going to wash their hands of it. I certainly agree with that, Your Honor, and I'll tell you that had one of these officers called any one of us that day and said, here's our situation, is there a case that tells me what I can and can't do, I would have had to tell them I'm not aware of a case that says... You could have told the Myers. I'm not sure what Myers says, but I've reviewed the cases in the briefs, and I've reviewed the cases that were cited, and I'm not aware of a case that says that it was a violation of any clearly established right to do what these officers did on this day. I don't think they violated any constitutional right at all. They certainly didn't violate any clearly established constitutional right with respect to Tazen or his mental illness or what they were doing or anything of that nature. These officers were trying to execute a lawful order in a lawful manner. If in hindsight we could find a better way, I'm willing to listen to that, but that's not what the court cases say. The court cases say that they get the benefit... Myers doesn't say that. Look, page 735 of Myers that talks about unnecessary, gratuitous, and disproportionate use of force, whether arising from a gun, a baton, a taser, or other weapon, precludes the officer from being awarded qualified immunity when the subject is unarmed and not a threat. I don't know the facts of that case, Your Honor. I do know... It was remarkably similar. Mr. Myers, I wrote the opinion. Mr. Wyers was a person who was mentally ill, except he was threatening the officers with a baseball bat for a while during the encounter. And then once he was subdued, the officers continued... The bat was away from him. The officers continued chasing him. Now I remember that case, Your Honor. In the Myers cases where they actually did use the taser or three applications for which they were granted qualified immunity, and then after he was subdued... Because he posed a threat at that point, but at which point he no longer posed a threat to the police officers, the court said that that was an issue for the jury. Because Myers was subdued at that point. Well, Mr. Armstrong was 260 pounds sitting on the ground holding onto a pole. He wasn't anything but passive at that point. May I answer, Your Honor? My time is up. I believe he was more than passive, Your Honor. I think he was actively, aggressively resisting being taken into the hospital by these officers. Thank you very much. Counselor, do you have some time for rebuttal? Mr. Tuzzi, could you start off by telling us why Sergeant Shepard shouldn't be entitled to qualified immunity? She wasn't part of this tasing escapade. I mean, the other two officers were directly involved in the direction and the application, one of each, but Sergeant Shepard seems to me as pretty much the person who is utterly blameless in this. I mean, she was trying to talk to him. She engaged him for 28 minutes. She did nothing, as far as it seems to me. Can you tell me why she should still be in the case? It seems to me Judge Eagles was absolutely right with regard to Sergeant Shepard. Your Honor, with all candidacy, I'd like to correct one point of fact. The only officer who used the taser was Officer Gatling. Right, but the other one, Officer McDonald, told him to use the taser. Right. But Shepard didn't do anything. Actually, Shepard did. With regard, she was on his back afterwards. That's correct. But she had nothing to do with the taser. Isn't that correct? That is correct. She did not have anything to do with the taser, but she stood on his back. And that is an issue of material fact. That she stood on his back? That is correct, Your Honor. In the record, I believe it's pages 253 through 255 in the Joint Appendix, Gina Lopez testified that she stood on the middle of his back and the lower part of his back while he was being handcuffed. Also, Lieutenant McDonald placed his knee between the shoulder blades of Mr. Armstrong. There is a question of material fact as to whether or not, how long he had it on there, how much pressure, and that's precisely what a jurorship side. There is always a question of material fact in these cases because they unfold rapidly. I've never seen one of these cases that didn't present disputed issues of fact because the recollections about them differ. But I keep coming back to the point that there's no issue of material fact about the fact that he was harming himself. There's no issue of material fact that they had a civil commitment order. There's no issue of material fact that he didn't want to be in that hospital. There's no issue of material fact that his sister wanted him in the hospital. No issue of material fact that he is very strong. There's no issue of material fact that they haven't had the opportunity to frisk him and find out whether he has some sort of thing that could harm himself. There's no issue of material fact that he's singeing himself with cigarettes. There's no issue of material fact that traffic is coming within two feet of him. There's no issue of material fact that he's eating grass. And there's no issue of material fact that the officers are faced with a very difficult, unpredictable, erratic person who could harm himself, and it would be a tragedy for all concerned. That's what they were trying to prevent, and that's what they're now being hauled into court for. It's unbelievable. Of course, I always give counsel the last word. Your Honor, this has gone through a laundry list of things that he believes pose no issue of material fact. However, there still remains an issue as to whether or not the officer's actions were reasonable compared to a reasonable officer, and that is the point in this case. And that is what's left up to the trier fact, not the court, to decide. Thank you, Your Honor. Thank you very much for your argument, both of you. We'll come down and meet counsel and move into our next case. Thank you.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, Stephanie D. Thacker